## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JOHN G. KAIN FARMS, LLC d/b/a** | § | |
| **JAY KAY FARMS** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:21-cv-374** |
| | § | |
| | § | |
| **KEMIN INDUSTRIES, INC.** | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOHN G. KAIN FARMS, LLC d/b/a JAY KAY FARMS, Plaintiff in the above-styled and numbered cause, and files this Plaintiff's Original Petition complaining of and about KEMIN INDUSTRIES, INC., hereinafter called Defendant, and for cause of action would respectfully show unto the Court the following:

### I.

### Nature of Complaint

1.     This is an action for damages and declaratory relief to remedy breach of contract, fraud and negligent misrepresentation.

### II.

### Jurisdiction and Venue

2.     Jurisdiction is conferred on this Court through diversity jurisdiction under 28 U.S.C. §1332.  Complete diversity of citizenship exists between the parties and the amount in controversy exceeds the sum or value of $75,000.00.  This court has jurisdiction over Kemin Industries, Inc. because Kemin Industries, Inc. does business in the State of Texas.  Kemin is a resident of Des Moines, Iowa and it has its principal place of business there.  Kemin Industries,

Inc. is incorporated in the State of Iowa. Jay Kay is a limited liability corporation organized and operating in the State of Texas; specifically, Frio County, Texas.

3.      This Court's jurisdiction to enter a declaratory judgment is invoked under 28 U.S.C. §2201.

4.      Venue is proper in the Western District of Texas because a substantial portion of the events on which these claims are based occurred within this district. Additionally, Kemin does business in Texas and may be found in this district.

## III.

## Parties

5.      Defendant, **Kemin Industries, Inc.** is a foreign for profit corporation, whose principal place of business is located at 2100 Maury Street, Des Moines, IA 50301, but who conducts operations in Texas. Kemin may be served with process by serving its registered agent, **CT Corporation, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136 USA.** Service of process is authorized under 29 U.S.C. §1132. Kemin is incorporated in the State of Iowa.

6.      Plaintiff, JOHN G. KAIN FARMS, LLC d/b/a JAY KAY FARMS, is a business entity registered and operating under the laws of the State of Texas who maintains real properties and agricultural operations within the State and more particularly in Frio County, Texas.

## IV.

7.      Defendant, KEMIN INDUSTRIES, INC. develops and manufacturers specialty ingredients for feed, health, nutrition, textiles and commercial horticulture markets worldwide. Though headquartered in Des Moines, Iowa, they have at least ten (10) offices located throughout the Untied States, including Brookshire, Texas and Texarkana, Texas.

2

8.    JK owns approximately 2,600 acres of South Texas agricultural land in Frio

County, Texas.  Such land possesses three (3) water wells and has approximately 1,097 acres of

land under irrigation.  As a result, the subject property was extremely valuable for agricultural

purposes as it was not subject to the drought conditions which normally affect dry land

agricultural producers in South Texas.  Over the years, JK leased such land to various

agricultural producers who took full advantage of the land's potential to raise crops, cattle, etc...

9.    In 2017, Kemin, recognizing the benefits of JK's irrigated farm land, approached

JK about a long-term lease agreement whereupon they would pay JK a negotiated amount to use

the irrigated land with the intent of growing crops suitable for their business purposes.

10.    Over several months, the parties negotiated a long-term lease agreement through

their various representatives.  During this time, the parties negotiated various material terms to

include, but not be limited to:  length of the lease, cost of the lease, use of the lease,

responsibilities of the parties, etc... with various drafts being exchanged by and between the

parties.  Ex. A.  Attached hereto as Ex. A and referenced herein as if fully set forth at length is a

true and correct copy of the Lease Agreement.

11.    During these negotiations, Kemin insisted that an existing well (Well #3)

currently pumped with a diesel engine, be switched to electric at JK's expense.  Kemin also

requested that additional pivots be added at JK's expense.  JK agreed to these requests,

contingent upon Kemin's mutual agreement for a liquidated damage clause for early termination

to, in part, help defray the cost/expense of JK's conversion and the added pivots.  The clause also

compensated Plaintiff for the length of time it might take JK to find a new Lessee for the

remainder of the lease period, and at a comparable cost, should Kemin terminate early.  Such

3

factors being difficult to calculate, Kemin agreed and drafted the clause in the agreement to entice JK to sign. Ex. A (4.3)/

12.     When all parties were satisfied with the various negotiated material terms, the lease was executed by all parties. The final agreement was drafted by Kemin and executed on or about October 16, 2017 by John Greaves on behalf of Kemin. Ex. A.

13.     Generally speaking, the Lease contained the following material conditions/terms:

    1.     Identification of the parties;

    2.     Identification of the property to be leased; (2.1 - 2.2);

    3.     Fixed term tenancy (3.1 - 3.3);

    4.     Definitive rental rate (3.1 - 3.3);

    5.     Responsibilities/obligations of Parties during the Lease Term (5 - 30);

    6.     Termination of the Lease Agreement (4.1 - 4.3); and

    7.     Responsibilities/Obligations of the Parties Upon Termination (4.1 - 4.4).

Such terms provided a basic framework for the parties' actions and their relationship going forward. Ex. A.

14.     JK, based upon Kemin's request and pursuant to the Lease agreement, paid for the well conversion from diesel to electric and added the additional pivots. Such was for the benefit of Kemin's operation and to the detriment of JK, who incurred the additional expense.

15.     During the next two (2) years, the parties abided by the lease whereupon Kemin would pay the negotiated lease payments and they were provided the irrigated lands to grow their crops. In fact, on or about May 18, 2018, Kemin, pursuant to the Lease Agreement, exercised their right to farm additional and contiguous lands owned by JK at the previously agreed upon

price of $225.00/acre. Ex. A (2.2) (3.1); Ex. B. Attached hereto as Ex. B and referenced herein

as if fully set forth set at length is a true and correct copy of the First Amendment to Farm Lease

dated May 15, 2018. The acreage was increased from approximately 935 acres to approximately

1,097 acres, per the First Amendment to Farm Lease. Ex. B. Annual payments were increased to

$246,825.00 to account for the additional acreage. Ex. B.

     16.    During the pendency of the lease, JK performed all their contractual

responsibilities/obligations under the negotiated Lease Agreement(s). Kemin has wholly failed

to perform their contractual responsibilities/obligations under the Lease Agreement(s).

     17.    On or about July 28, 2020, after approximately two (2) years, JK was notified by

John Greaves that Kemin would be terminating the Lease Agreement(s) early. At that time,

Kemin represented that they were terminating the lease early "due to intense competition from

low cost producers." Ex. C. Attached hereto and referenced herein as if fully set forth set at

length as Ex. C is a true and correct copy of such correspondence, dated July 28, 2020. Despite

this notification, JK fully expected that Kemin would abide by the early termination clause of the

Lease Agreement they had previously negotiated. Ex. A (4.1 - 4.4).

     18.    The Lease Agreement provided that upon early termination, Kemin was to pay JK

rental payments for an additional twenty-four (24) months and work with Lessor to find a new

Lessee. Ex. A (4.3). This amount was supposed to help defray JK's initial cost for the well

conversion and additional pivots, which Kemin had requested. It was also supposed to

compensate JK for the loss of a long-term tenant and the incalculable time it would take them to

find another long-term tenant who would pay a comparable price for the remaining term of the

Lease. Kemin wholly failed to satisfy their obligations upon early termination of the Lease.

19.    Upon termination, Kemin was also required to return the equipment and premises in "good working order." Ex. A (5) (23.2). Kemin left the premises with one well, (Well #1) not in "good working order" and failed to repair or tender expenses for same. JK notified Kemin of the issue, whereupon Kemin offered to pay JK $20,000.00 towards the well repairs if JK would sign a full and final release, releasing Kemin from any and all other contractual claims under the Lease Agreement. Ex. D. Attached hereto and referenced herein as if fully set forth set at length as Exhibit D is a true and correct copy of such offer/release dated September 29, 2020. JK rejected such overtures.

20.    Additionally, upon early termination, Kemin was required to help JK in the search for a new Lessee to help lessen the financial hardship of early termination. Ex. A (4.3) Kemin has wholly failed to provide JK with the names and numbers of any potential Lessees that would help defray the costs associated with the loss of Kemin as a long-term Lessee. Instead, Kemin has attempted to shift that contractual burden to JK.

21.    JK, pursuant to the Lease Agreement, notified Kemin of their breach and gave them thirty (30) days to cure same. Ex. A (4.1). Demand for payment was made on or about January 29, 2021. Ex. E. Attached hereto as Exhibit E and referenced herein as fully set forth at length is a true and correct of the Demand Letter dated January 29, 2021. Despite a response, no offer of payment under the previously negotiated Lease Agreement(s) were made/received and the names of the other prospective lessees were not provided. All conditions precedent to the filing of this petition have been performed or have occurred.

6

## IV.

## <u>Claims</u>

### <u>Count One - Breach of Contract</u>

22.      Plaintiff hereby incorporates paragraphs 1 - 21 above by reference as if fully set

forth at length herein in support of their claim that Kemin breached the Lease Agreement(s) with

JK dated October 16, 2017 and May 18, 20218.  Those Agreement(s) imposed contractual duties

that Kemin failed and refused to perform under these Agreement(s) upon termination.  Ex. A

(4.3), (5), (23.2).  Kemin had no valid excuse for its failure to perform its contractual obligations

under those Agreement(s).  Kemin's breach of its duties under those Agreement(s) caused

monetary and other harm to JK, for which Plaintiff seeks relief herein.  Such damages are more

fully set forth below.

23.      Plaintiff performed all its contractual obligations under the Lease Agreement(s).

Defendant, however, has not.  All conditions precedent to the filing of this lawsuit have been

performed or have occurred.

### <u>Count Two - Fraud</u>

24.      Plaintiff hereby incorporates paragraphs 1 - 21 above by reference as if fully set

forth at length herein in support of their claim(s), in addition or in the alternative to the claim(s)

set forth above.  Kemin, by and through their agents, employees and/or representatives, made

material representations regarding the obligations Kemin would perform under the Lease

Agreement(s) dated October 16, 2017 and May 18, 2018.  Ex. A.  The material

misrepresentations were false and were either known to be false when they were made or were

made by Kemin without knowledge of their truth.  Kemin intended that JK rely upon Kemin's

7

representations and used their representations to induce JK to execute the Lease Agreement(s).

JK would not have entered into these Agreements, but for the representations of Kemin.   JK did

in fact rely upon Kemin's representations and suffered substantial injuries and damages as a

result.  Such damages are more fully set forth below.

### Count Three - Negligent Misrepresentations

25.     Plaintiff hereby incorporates paragraphs 1 - 21 above by reference as if fully set

forth at length herein in support of their claim(s), in addition or in the alternative to the claims set

forth above for breach of contract and fraud.  Kemin, by and through their agents, employees

and/or representatives, made false representations regarding the obligations Kemin would

perform upon early termination of the Lease Agreement(s) dated October 16, 2017 and May 18,

2018.  Kemin intended that JK rely upon these representations to induce JK to enter into the

Lease Agreement dated October 16, 2017 and May 18, 2018.   JK would not have a entered into

these Agreements, but for these representations.  Kemin at a minimum, failed to exercise

reasonable care when it made these false representations to JK.  JK justifiably relied upon these

representations to their detriment when they entered into the Lease Agreement(s) that Kemin

drafted and of which Kemin took full advantage.  Kemin never communicated any limitations on

their represented obligations under the Lease Agreement(s).  JK was damaged by the negligent

misrepresentations of Kemin.  Such damages are more fully set forth below.

### VI.

### Damages

### (Applicable to All Counts)

26.     As a direct and proximate cause of Kemin's breach of its obligations and

8

responsibilities under the Lease Agreement(s), JK has suffered damages, both in the past and in the future. Specifically, Kemin, pursuant to the written Lease Agreement(s), owes JK the following damages:

a.  Two (2) annual payments, plus interest thereon until paid in full. Ex. A (4.1 and 4.3); Ex. B.

b.  Cost of repairing the well/irrigation equipment to "good working order" upon early termination, plus loss of use damages for the loss of said equipment. Ex. A (5) (23.2);

c.  Reasonable attorney's fees as allowed by Tex. Civ. Prac. & Rem. Code §38.001, et seq. for breach of the Agreement. Ex. E;

d.  All expenses and costs of this litigation;

e.  Lawful pre-judgment interest;

f.  Lawful post-judgment interest; and

g.  Any and all other damages of any nature and kind suffered by Plaintiff as a consequence of the acts and omissions of the Defendant as described more fully above.

## VII.

### Specific Performance

27.  In addition to, or in the alternative, JK seeks specific performance of those portions of the Agreement that Kemin, though obligated, has wholly failed to perform as set forth above. Ex. A.

28.  All conditions precedent to the filing of this lawsuit and Plaintiff's remedies have

been performed or have occurred.

## VIII.

### Jury Demand

29.     Plaintiff hereby makes application and requests that this case be set for a trial by

jury.

### Prayer

30.     WHEREFORE, PREMISES CONSIDERED, Plaintiff, JK, respectfully prays that

this Court grant judgment for Plaintiff, and against Defendant, and for all of Plaintiff's damages

and/or specific performances prayed for herein, and the Plaintiff have reasonable attorney's fees

and taxable costs of court, and such legal interest on said sums as allowed in law, and for such

other and further relief to which Plaintiff may show themselves to be justly entitled, either at law

or in equity.

Respectfully submitted,

**BROCK & BROCK, P.C.**
803 E. Mistletoe
San Antonio, Texas 78212
Telephone: (210) 733-6666
Telecopier: (210) 733-6893

BY: _____
KARL B. BROCK
State Bar No. 03044150
Email:  Karlb@brockandbrock.com

ATTORNEYS FOR PLAINTIFF

10

### Farming Lease of Jay Kay Farms Acreage

THIS LEASE made as of June 1, 2017 between John G. Kain Farms, LLC, dba Jay Kay Farms, of P. O. Box 1433, Pearsall, Texas 7806 (the "Lessor" or "Lessor") and Kemin Industries, Inc., of 2100 Maury Street, Des Moines, Iowa 50317, including its agents, assigns and representatives (the "Lessee" or "Kemin").

IN CONSIDERATION of the mutual covenants contained herein, the Lessor and Lessee, subject to the terms and conditions of this lease, hereby agree as follows:

### 1. COVENANTS.

As is Lease and Covenants: This is an **"as is"** lease. As such, Lessee agrees to accept the premises in its present as is condition, and to obey all laws, order, rules and regulations applicable to the use, condition, and occupancy of the premises. Lessee agrees to keep grass areas around center pivot points, in turn rows and long roadways mowed and will keep roadways maintained in good conditions. The following covenants apply without limitation to other covenants or obligations contained in this lease or required by law:

1.1.  The Lessor covenants with the Lessee:

    1.1.1.  for quiet enjoyment of the Leased Premises; and

    1.1.2.  to observe and perform all the covenants and obligations of the Lessor herein.

1.2.  The Lessee covenants with the Lessor:

    1.2.1.  to pay all amounts payable by the Lessee to the Lessor under this Lease (collectively the "Rent");

    1.2.2.  to observe and perform all the covenants and obligations of the Lessee herein;

    1.2.3.  to use the Leased Premises only for the purpose of farming legal crops on the Land and any and all uses ancillary thereto;

    1.2.4.  to comply with present and future laws, regulations and orders relating to the occupation or use of the Leased Premises;

    1.2.5.  not to do, omit to do or permit to be done anything which will cause or shall have the effect of causing the cost of the Lessor's insurance in respect of the Leased Premises to be increased at any time during the Term or any policy of insurance on or relating to the Leased Premises to be subject to cancellation.

    1.2.6.  to assume full responsibility for the operation and routine maintenance of the Leased Premises and for the routine repair or replacement of all fixtures or chattels located therein or thereon provided such repair or replacement is not a major repair or replacement exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises.



PLAINTIFF'S EXHIBIT

A

1.2.7.  to permit the Lessor to enter the Leased Premises at any time outside normal business hours in case of an emergency and otherwise during normal business hours where such will not unreasonably disturb or interfere with the Lessee's use of the Leased Premises or operation of its business, to examine, inspect and show the Leased Premises for purposes of leasing, sale or financing, to provide services or make repairs, replacements, changes or alterations as provided for in this Lease and to take such steps as the Lessor may deem necessary for the safety, improvement or preservation of the Leased Premises.

1.2.8.  to take out and maintain, in the name of the Lessor its agents and employees, the Lessee all risks property insurance with coverage for the full replacement cost value of the Leased Premises and other insurance as described herein.

1.2.9.  to promptly pay and discharge all expenses required to be paid by Lessee as described herein;

1.2.10. to maintain the Leased Premises and all improvements therein in good order and condition;

1.2.11. to cut or spray the weeds along the fences and to carry out and perform all acts required to be done under any Act or by regulations or by-laws with respect to weed and insect control;

1.2.12. that no live trees on the Leased Premises will be cut and no crop residue such as straw or cornstalks will be burnt without the prior written permission of the Lessor;

1.2.13. not to remove sand, gravel, topsoil or minerals from the Leased Premises;

1.2.14. to pay all of the costs and expenses associated with the Lessee's obligations directly to the appropriate party as they come due and shall, at the Lessor's request, provide the Lessor with copies of receipts or other proof acceptable to the Lessor that such costs have been paid. If the Lessee fails to perform any obligation under this Lease or to pay any costs and expenses as set out herein, the Lessor may at its sole option and discretion, on seven (7) days written notice to the Lessee, perform such obligation or pay such amounts on behalf of the Lessee and the Lessee shall forthwith upon receipt of an invoice therefor reimburse the Lessor for the cost of such action or the amount of such payment.

## 2.  GRANT.

2.1. Lessor hereby leases to the Lessee and the Lessee hereby leases from the Lessor approximately 935 acres of land (the "Land" or "Leased Premises") under and around current pivot irrigation in Frio County, Texas described by FSN 523 as the Jay Kay Ranch in Frio County, Texas, save and except certain areas as follows in Paragraph 16, a break down for each system covered by this lease is shown in the graphic attached hereto and made a part here of as Exhibit 1, with the following approximate acres measured from the center pivot point for each system:

80 acres of field number 1
80 acres of field number 2 and part of number 1

80 acres of field number 4
60 acres of field number 5a (western most pivot of field 5)
55 acres of field number 5b (eastern most pivot of field 5)
115 acres of field number 7a (western most pivot of field 7)
115 acres of field number 7b (eastern most pivot of field 7)
190 acres of fields number 9 and 10
160 acres of fields number 11 and 12

2.2. Additional acreage of approximately 335 acres of FSN 523 farmed under and around additional
pivots systems during this lease will or may be added to the Land leased under terms in like
manner as illustrated as follows:

160 acres to be added from fields 15, 16, and 17  (to be added after signing in 2017 but no
later than in Spring of 2018)
110 acres to be added from fields 18 and part of 19 (to be added in Spring of 2018 if
requested by Kemin in writing)
65 acres to be added from fields 8 and part of 19 ( to be added in Spring of 2018 if)requested by
Kemin in writing)

Payment for additional acreage will be made within 30 days after new systems are up and operational
for year 2017 and at annual anniversary for those installed in 2018.

## 3.  RENT AND TERM.

3.1. The term of this Lease shall be ten (10) years beginning on September 1, 2017 and ending on
August 31, 2027 ("Term"). The rent for the acreage of this lease shall be $225.00 per acre payable
annually as follows:

Years 1-2:  The annual lease payment shall be paid in one installment of two hundred ten
thousand three hundred seventy-five dollars ($210,375.00) beginning at the signing of this Lease and on
its one year anniversary.
Years 3-10:  The annual lease payment shall be paid in two equal installments of one hundred
five thousand one hundred eight-seven dollars and fifty cents ($105,187.50); the first payment to be
paid on the anniversary of the signing of this Lease; and the second payment due on or before the
immediately following February 1 of the given calendar year.

3.2. All amounts payable by the Lessee to the Lessor pursuant to this Lease shall be deemed to be Rent
and shall be payable and recoverable as Rent in the manner herein provided and the Lessor shall
have all rights against the Lessee for default in any such payment as in the case of arrears of rent.
The Lessee shall pay to the Lessor interest at a rate equal to one and a half percent (1.5%) per
month, upon any default in payment of Rent from the due date for payment thereof until the same is
fully paid and satisfied.

3.3. Renewal Option: There will be one (1) option to renew for 5 years if both parties agree to terms
and considerations to be negotiated six (6)  months prior to renewal.  Lessee agrees to yield
possession of the acres covered by this lease at the termination date of the lease.  Notwithstanding
the number of renewals, if any, this lease is and always shall be interpreted as a fixed term lease
and not an indefinite term lease.

**4. TERMINATION.**

4.1 Lessor may terminate this Lease if Kemin fails to make payments to Lessor as provided in this Lease, giving Kemin a thirty (30) days notice to cure such failure plus interest at a rate of one and a half percent (1.5%) per month. A thirty (30) day notice will be given for all breaches of this contract with each party being given a 30 day notice to correct said breach.

4.2. Lessee shall have the right, at any time during the initial term or any renewal period hereof by giving notice in writing to Lessor, to terminate this Lease forthwith without judicial action in any of the following events:

4.2.1. Any breach of this Lease by Lessor not cured within thirty (30) days after written notice thereof;

4.2.2. Insolvency or bankruptcy of Lessor, and/or the appointment of a trustee or receiver in bankruptcy for Lessor, and/or inability or failure to perform obligations as the same become due;

4.2.3. A substantial change of ownership of Lessor effected without the prior written approval of Lessee;

4.2.4. Hiring a manager or personnel that is known by Lessee to be working with or have a history of working with a competitor of Lessee, provided however, that Lessor shall have an opportunity to terminate such a manager or personnel within thirty (30) days after receiving notification and verification from Lessee.

4.2.5. The acquisition or direct or indirect control of Lessor by any person, firm, company, or entity that competes with Lessee;

4.2.6. Lessor loses title to the Leased Premises or pivots furnished herein and does not cure within a reasonable time;

4.2.7. Irreversible loss or damage to Lessee's proprietary crop; or

4.2.8. In the event Lessee no longer engages in growing oregano and growing a replacement crop is not economically feasible.

4.3 In the event Lessee terminates the lease for any of the foregoing reasons, Lessee shall be responsible for the rent payment due to Lessor for a period of the following twenty-four (24) months and shall work with Lessor to find a new lessee. Notwithstanding the foregoing, Lessee cannot terminate for reasons set forth above in subparagraphs 4.2.7 and 4.2.8 until year 3 of this Lease.

4.4. Lessee shall retain all rights to all cuttings, plugs, plants, biomass and all materials related to such upon termination of this Lease for any reason whatsoever.

**5. WELLS AND PUMPS.**

This lease includes the use the Kain Number 1, 2 and 3 Carrizo water wells located on the property. All three wells have either almost new or like new Simmons Turbine Pumps with new column pipe, shaft and tubing. Well Number 1 is currently powered by electricity and was at last inspection in working order. Well Number 2 is also powered by electricity, but was recently struck by possibly lightning at the power pole. Lessor will repair Well Number 2 at his cost as soon as possible and will notify Lessee to allow for Lessee's inspection to show the well in good working order. Well Number 3

is currently powered by Detroit Diesel and has three phase power to the well head.  Lessor will convert
Well Number 3 to electric power as soon as possible after signing of this lease and will notify Lessee to
allow for Lessee's inspection upon completion of said work. Lessee will  then use, repair, and maintain
said wells at his sole cost. Lessee's obligation to pay for repairs and replacement shall not include major
repairs or replacement exceeding twenty thousand ($20,000.00) dollars.  If such a repair or replacement
exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with
Lessee's  liability not exceeding twenty thousand ($20,000) dollars except as follows.
Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or
major, resulting directly from its use of the Leased Premises. Lessee, or anyone in lessee's organization,
has no authority to adapt, change or tamper with these wells, pumps or motors in any way without
written approval from Lessor PRIOR to such work being performed. Solansky Pump and Welding will
be used for all well and pump work. Lessee agrees to maintain constant drip oil in the pumps along with
all other directives of Solansky Pump and Welding. Solansky phone number is 830/374-3318. Lessee
agrees to pay Solansky Pump and Welding within 30 days of invoice date for work done on the property
covered by this lease.  Lessee agrees to return these wells in good working order per Solansky Pump
and Welding or a successor company and make any repairs or replacements deemed necessary by said
company at the end of the lease. Notwithstanding, if Solansky Pump and Welding is unavailable or no
longer in business, Lessor may appoint another contractor to perform the work.

## 6.   FARMING EQUIPMENT.

Lessee shall furnish all of its farming equipment as well as any non-farming equipment as needed
by it in its operation at his its expense, and keep the premises neat and orderly.

## 7.   FENCES.

Lessee further agrees not to cut or alter any fences or gates unless expressly agreed to in writing by
Lessor, and also agrees to maintain the entrances to the Leased Premises from FM 1582 and CR 3401.
Lessee agrees not to break established water courses or ditches, or undertake any operation that will
injure the Leased Premises. Lessee is to repair, replace, or maintain all fences and will leave the
property in as good or better condition as Lessee found it provided such repair or replacement is not a
major repair or replacement exceeding twenty thousand dollars ($20,000.00). If such a repair or
replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost
with Lessee's  liability not exceeding twenty thousand ($20,000) dollars except as follows.
Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or
major, resulting directly from its use of the Leased Premises. Any new fences, whether built by Lessor
or Lessee at any time during this lease, will be repaired to like new condition by Lessee as needed if
damage has occurred to these fences as a result of Lessee, or any of Lessee's operations prior to the
expiration of this contract. Lessee may build fences for his own benefit at his sole cost, with prior
written approval of Lessor as to type, location, and construction of said fences.  Lessor and Lessee will
meet prior to the signing of this lease to discuss possible sites for internal fencing if needed.

## 8.   ADDITIONSA AND IMPROVEMENTS.

Lessor and Lessee agree that any permanent additions to the property will remain with the property and
become property of the Lessor.  Any improvements by Lessor, any oil company, or associated company
to the property will be the property of the Lessor.  Any temporary improvements by Lessee which result
in Real Estate Taxes known locally as Roll Back Taxes will be paid by Lessee for the period of five (5)
years prior to assessment of said Taxes and for the period of five (5) years forward from the termination
date of lease or any renewal when the temporary improvements are removed.  Any improvement of any

kind, whether temporary or permanent must have prior written approval from the Lessor as to the location of said improvements.

## 9. INDEMNITY, LIMITATION ON LESSOR'S LIABILITY AND WARRANTY.

9.1. The parties covenant and agree that as a consideration for the granting of this lease, Lessee agrees to indemnify and hold the Lessor harmless. The Lessee shall indemnify and save harmless the Lessor and its agents and employees from any and all liabilities, damages, costs, claims, suits or actions growing or arising out of:

    9.1.1.   any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of the Lessee to be fulfilled, kept, observed and performed;

    9.1.2.   any damage to property while the property is in or about the Leased Premises; and

    9.1.3.   any injury to person or persons including death resulting at any time therefrom occurring in or about the Leased Premises as a result of Lessee's negligent conduct.

9.2. Lessor warrants that it has title or the right to lease the Leased Premises and pivots provided herein under this Lease. Notwithstanding the foregoing, Lessor has disclosed to Lessee that the title to pivot 7A may be challenged by third parties ("Title Dispute"). In such event, Lessor agrees to defend against Title Dispute at its own cost and expense until final resolution by agreement or final non-appealable judgment by a court of competent jurisdiction. In the event Lessor loses title to said pivot Lessor shall without delay and at its sole cost remedy the situation to ensure Lessee's crop is not compromised. In connection therewith, Lessee agrees without delay to cooperate fully with Lessor and to provide any information available and assistance that will assist Lessor in protecting the crop.

9.3. Hold harmless agreement: Lessee further covenants and agrees to indemnify, defend, and hold harmless the Lessor from and against any and all damages, claims, suits, demands, and actions of any kind, whether for injury to person or loss of life, or damage to property resulting from or arising out of the use of the Leased Premises by Lessee and for the damage to anyone or anything resulting from Lessee's farming operations or any other operations on the Leased Premises. Likewise, Lessee shall be liable for any attorney fees incurred by Lessor defending themselves from any claims mentioned above including but not limited to:

    9.3.1.   From theft in or about the premises resulting from Lessee's negligent conduct;

    9.3.2.   From interruptions in any electrical service from any cause whatsoever;

    9.3.3.   From any injury to any person of damage to any goods, wares, property or merchandise caused by Lessee's negligence

    9.3.4.   From spraying, fertilizing and chemical applications by Lessee affecting the premises or surroundings.

9.4. Limitation of Lessor's Liability: The Lessor and its agents and employees shall not be liable for any damage to the Leased Premises or any property located therein caused by any latent defect or by steam, water, rain or snow which may leak into, issue or flow from any part of the Leased Premises or from the water, steam, sprinkler or drainage pipes or plumbing works of the same or from any other place or from any damage caused by or attributable to the condition or arrangement of any electrical or other wiring or for any damage caused by anything done or omitted to be done by any person or for damage caused by interruption or failure of any service or utility or for

damage however caused to merchandise, stock in trade, books, records, files, money, securities, negotiable instruments, papers or other valuables.

9.5.   Liability Insurance: The Lessee agrees during the Term to secure and pay the premium upon a policy of liability insurance against liability claims for bodily injury, property damage and death arising out of or in connection with Lessee's operation of the property described under the terms of this Lease with minimum liability limits of a minimum of $300,000.00 for injury to or death of one person, $1,000,000.00 for all claims arising out of one (1) occurrence, property damage limits of $100,000.00, and an umbrella policy of a minimum of $1,000,000.00.  Lessee also agrees to furnish to Lessor a copy of Lessee's insurance binder listing Lessor as an additional insured on Lessee's policy within 30 days of execution of this lease.

## 10.  HUNTING AND FISHING.

There will be absolutely no hunting or fishing allowed by Lessee or anyone associated with Lessee on the Leased Premises or any of Lessor's property, and this lease conveys no right to Lessee or anyone associated with Lessee to hunt or fish on the Leased Premises or any of Lessor's property.  Lessor expressly retains all rights to the hunting and fishing. Notwithstanding the foregoing, Lessor shall refrain from accessing or allowing access to the Leased Premises for the purpose of hunting or fishing without prior approval from Lessee. Lessee shall respond to Lessors inquiry for permission to hunt or fish within 24 hours of receipt of such inquiry. Lessee's failure to respond to Lessor's inquiry within 24 hours shall be deemed as providing permission. Notwithstanding, Lessor shall retain the right of hunting for the purpose of predator control without the requirement of notice to Lessee.  Lessor's use of the Leased Premises as set forth in this paragraph will not interfere with the Lessee's use or quiet enjoyment of the Leased Premises.

## 11.  ASSIGNMENT, SUBLEASING, PLEDGING AND TRANSFERS BY LESSEE.

With the Lessor's prior written consent including but not limited to Lessor agreeing to the terms and conditions thereunder, Lessee may assign, sublet, pledge or transfer this Lease or any interest therein or in any way part with possession of all or any part of the Leased Premises, or permit all or any part of the Leased Premises to be used or occupied by any other person. Lessor shall not unreasonably withhold consent. It shall not be unreasonable for Lessor to withhold consent if a person to whom an assignment, sublease, pledge or transfer is proposed is not financially healthy, does not have an acceptable business reputation, or is not agreeable to the same conditions and terms set forth in this Lease. Additionally, Lessee may not enter any such agreement or instrument with a third party that limits Lessee's liability, duties or obligations under this Lease, without the express written authorization of Lessor.

## 12.  GATES AND SECURITY.

Lessee agrees to keep all gates locked and use locks furnished by Lessor. Lessor will supply Lessee with keys needed for his operation, and Lessee will furnish names and identification of those individuals to whom the keys shall be issued and a description of the vehicles that will be commonly used on the property.

## 13.  WILDLIFE PROGRAMS AND WATER.

Wildlife Management Program currently implemented by the Lessor must not be harmed in any way by operations of Lessee.  Lessee agrees to keep current water reservoirs and tanks piped to from the Number 1, 2 and 3 water wells as full as possible at all times due to the fact that certain crops will require a water priority from time to time and water will understandably be diverted to crops during

these times.  Lessor retains the right to pump from these reservoirs and tanks for uses as Lessor deems
necessary.

### 14. SUCCESSORS AND ASSIGNS.

This Lease shall enure to the benefit of and be binding upon the successors and assigns of the Lessor
and the heirs, executors and administrators and the permitted successors and assigns of the Lessee.

### 15. SUBORDINATION.

Lessor shall refrain from creating a mortgage, deed of trust or other similar lien or encumbrance (a
"Mortgage") upon or affecting Landlord's fee estate in the Property or title to the pivots thereon.
Notwithstanding the foregoing, in the event Lessor creates a security interest in the form of a Mortgage
upon or affecting Lessor's fee estate in the Property or title to the pivots, or any part thereof, with the
consent of Lessee, Lessor shall provide a recordable SNDA acceptable to Lessee whereby Lessee's
rights to the Property and pivots will not be disturbed by any mortgagee so long as Lessee continues to
abide by the terms of this Lease.   Any holder of any such Mortgage is herein referred to as "Landlord's
Mortgagee(s)."  Notwithstanding the foregoing, an approved Landlord's Mortgagee may at any time
subordinate its Mortgage to this Lease without Lessee's consent by notice in writing to Lessee, and
thereupon this Lease shall be deemed prior to such Mortgage without regard to their respective dates of
execution and delivery and, in that event, such Landlord's Mortgagee shall have the same rights with
respect to this Lease as though it had been executed prior to the execution and delivery of any such
Mortgage and had been assigned to such Landlord's Mortgagee.

### 16. OFF-LIMIT AREAS.

Certain areas which are strictly off limits are areas around any oil or gas well, whether existing at the
time of signing of this lease, added after signing or planned for future development of the property for
oil and gas purposes, provided such addition after the signing of this Lease does not interfere with
Lessee's use of the Leased Premises.  The area inside the fence around the Jay Kay Ranch Airport is also
an off-limit area.  No improvement is to be erected in the flight path of the Jay Kay Ranch Airport.

### 17. OIL AND GAS EXPLORATION AND DEVELOPMENT.

Lessee is aware that the property is under an agreement or is in negotiation for an agreement for the
development of the property for oil and gas exploration. Each lease agreement is independent of the
other. However, this lease is subject to conditions of the oil and gas lease, as it is currently in place or
any oil and gas lease that is executed in the future. Lessor has tried to lessen the impact of such
exploration on the leased property. Planned well sites are on the eastern and western most perimeter
property lines and in property corners or other areas not within the circle under irrigation equipment.
Placement is designed to lessen the impact on any given irrigation circle. Any oil or gas lease will not
affect Lessee's use of any acreage under an anchor pivot. However, there may be some impact and that
acreage removed from the leasable acreage, namely acreage that is not under an anchor pivot, and the
rental payments will be adjusted accordingly should this occur. Additionally, in the event of loss of
acreage on which Lessee has planted crop (i.e. acreage under an anchor pivot), Lessor shall compensate
Lessee for loss of said crop, including but not limited to establishment. The stated oil and gas
exploration shall have priority in all instances. The oil and gas companies and their affiliated parties are
responsible for all their damages to the property and to the Lessee, only to the extent that the damage
has occurred to improvements or crops of Lessee and at the actual dollar cost of the improvement or
crop. Lessee should notify Lessor should any damages occur prior to contacting the oil and gas
company, whomever they should be.

## 18. ELECTRIC BILLS.

Lessee has agreed to pay the Medina Electric bills upon receipt covering the current electric motor and pivots and any future electric motors installed for the Leased Premises during the term of this Lease.

## 19. GOVERNMENT PROGRAMS.

From time to time, the usage of the Equip Program of the Farm Services Agency may become available. Lessee may use this program for its benefit at its sole cost and expense. At no time will any use of this program encumber the Leased Premises or obligate the Lessor in any way. Should Lessee wish to have Lessor participate in such programs, Lessor would have to consent in writing prior to any obligation. Lessor retains all rights to any USDA programs associated with the property, such as the DCP programs and alike.

## 20. AMENDMENT OR MODIFICATION.

This lease may be amended, modified or supplemented only in writing, and any amendment, modification or supplement shall not be valid or binding unless signed and dated by both Lessor and Lessee.

## 21. PASTURES AND FIELDS.

Lessee agrees to keep all areas where center pivot circles are and places where new ones may be in the future clear of brush and obstruction, and maintained as cleared pastures or fields and just in the circular pattern covered by each system. The areas referred to are in exhibit 1 attached to this lease.

## 22. IRRIGATION AND RELATED EQUIPMENT.

Lessee agrees to maintain all pivots and above ground equipment during the Term, including but not limited to drip oil used to lubricate downhole shaft, tubing, and pump. However, Lessee shall inspect all pivots and above ground equipment within 10 days of signing this Lease and notify Lessor of its findings. Should any downhole damage or underground line damage occur that can be attributed to Lessee's neglect or misuse, Lessee will be held responsible for the routine repair or replacement to return the well or wells and lines to working condition provided such repairs or replacements are not major repairs or replacements exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. The diesel fuel at the pole barn location on the western side of CR 3401 and at the location known as the Numbers 2 water well on the eastern side of CR 3401 are for Lessor's use only. If crops are planted, Lessee agrees to hold Lessor harmless should any failures in irrigation equipment occur and for whatever reason cannot be fixed or returned to operation in a timely manner due to circumstances beyond Lessor's control. Should this situation arise, all parties agree to work together to get water to crops as soon as possible in order to avoid any damage.

## 23. SYSTEMS, EQUIPMENT AND IMPROVEMENTS.

23.1. Lessor to furnish Lessee during the term hereof with fully operational self-propelled irrigation systems including water sources and power sources as stated in this Lease under Premises Description. Said systems to be used by the Lessee on the Leased Premises only. Other system(s) to be added under terms of the Paragraph 2 of this lease agreement. Lessee to make all routine repairs and replacements to the systems during the term of the lease which are necessary to keep

said systems in working order including but not limited to the well, turbine, power unit, system alignment, all electrical systems, tire and wheel repair, gear boxes, driveshaft's and final drives provided such repairs or replacements are not major repairs exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. Lessee shall bear the expenses of all repairs resulting from the negligence of the Lessee, its agents and employees.  Lessor shall cover all damage to said systems during the term of the lease which is due to Acts of God, and shall forthwith have said damage to the systems repaired under Lessors insurance policy.  Lessor shall not be liable for any resulting crop damage due to damage to the irrigation system(s) or any type of mechanical failure of the irrigation system(s) and related equipment caused by Acts of God.

23.2. Lessee shall at the expiration of said lease return the demised premises, irrigation system(s) and related equipment to Lessor in good working order, only ordinary wear and tear from normal use excepted.  Lessor shall be allowed free access to the premises to examine or inspect the irrigation system(s) or to make needed alterations or improvements to the total system(s).  Responsibility for the costs of all oil, lubrication, fuel and general maintenance required to operate the irrigation system(s) shall be that of the Lessee.  The contacts for the Reinke systems is Mike Titzman @ 830/480-0622 or Don Baker @ Baker Irrigation in Uvalde, Tx.  Mike Titzman or a Reinke dealer must to be used in order to maintain the integrity of the warranties on those systems.

23.3. Lessee and Lessor agree that the sole responsibility for the physical operation of the entire irrigation system(s) is that of the Lessee.

23.4. Lessor agrees that he will instruct Lessee on the operation of the system(s) and water sources in order that the Lessee may operate the same in the absence of the Lessor whenever necessary.  It is agreed by Lessor and Lessee that Lessee may fertigate or chemigate through the irrigation systems during the term of the lease.  Lessee shall provide for proper plumbing, injection pump, electrical and safety equipment on the entire irrigation system(s) to allow chemigation and fertigation.  All costs of chemicals and fertilizer will be paid for by Lessee.

23.5. The Lessee may from time to time at its own expense make changes, additions and improvements to the Land to better adapt the same to its business, provided that any change, addition or improvement shall be made only after obtaining written consent of the Lessor, and shall be carried out in a good and workmanlike manner and only by persons selected by the Lessee and reasonably approved in writing by the Lessor. The Lessee shall pay promptly when due all costs for work done or caused to be done by the Lessee in the Leased Premises which could result in any lien or encumbrance on the Lessor's interest in the property, shall keep the title to the property and every part thereof free and clear of any lien or encumbrance.

## 24. WATER PRIORITY.

Due to the fact of the time-sensitivity of the watering regime during the growing season, it is agreed Lessee shall have priority for water usage as long as tanks and reservoirs are full.

## 25. TITLE.

25.1. Lessee shall use the Lease Premises solely for farming.  Lessor agrees that title to any crop shall vests always in said Lessee and Lessee shall bear all expenses of producing same.  Lessee may cultivate 935 acres plus an additional 335 acres set out in Premises on Page 3 of Kemin proprietary oregano clonal lines KI1750 and KI1850 or other Kemin proprietary clonal lines or other desired crop.  Lessor acknowledges that cuttings, plugs, plants, and biomes and all related to such remain property of Kemin at all times.  Kemin agrees to destroy said plants, plugs, cuttings, and biomes and any other related materials prior to termination lease term, and disk up and clean fields to plantable condition by termination date.

25.2. Lessor acknowledges that Lessee or its assignee shall retain all rights and title in and to the proprietary oregano clonal lines, KI1750 and KI1850, any and all biomass resulting from the growing of said proprietary clonal lines, and any and all oil produced by steam distilling said proprietary clonal lines. Lessor shall not place a lien on or encumber in any way Lessee's proprietary oregano clonal lines, KI1750 and KI1850, any and all biomass resulting from the growing of said proprietary clonal lines, and any and all oil produced by steam distilling said proprietary clonal lines. Lessor acknowledges and agrees that Lessee may file and perfect a lien upon the crops grown under this Lease.

## 26. CUSTOM WORK.

Any custom work whereby Lessee hires Lessor or Lessor hires Lessee will be by separate agreement and at prevailing custom rates and agreed to by both parties on each particular project or job.

## 27. SOIL AND WATER TESTING.

Lessee shall have the right to make such soil and water tests as he deems necessary.  Lessor agrees to provide what tests he currently has to Lessee if asked to provide such tests.

## 28. END GUN CLARIFICATION.

All irrigation systems except the one located in field 5b have endguns, and acreage covered by those endguns are included in the acreage as irrigated land.

## 29. AIRSPRAY.

To the best of the knowledge of the Lessor, there are no restrictions on the above- described land with regard to the usage of airplanes for the application of pesticides according to labeled usage during the term of this lease

## 30. SELL OF PROPERTY.

The Leased Premises under current ownership is not now and has not been listed for sale, and there is no intent to list or sell the property in the foreseeable future.  However, even with the best of plans, circumstances arise which require tough decisions.  Lessor retains the right to sell the property if he deems circumstances necessary for him to do so.  Any such transfer shall be subject to this Lease Lessor will inform Lessee as soon as Lessor has made the decision to sell the property so that Lessee may have a first right of refusal to purchase the Leased Premises and adjacent acreage proposed for sale. Lessee shall have thirty (30) days to effectuate its option. In the event Lessee purchases the Leased Premises, this Lease will terminate on date closing of sale.

## 31. INTERPRETATION OF LEASE.

All effort has been made to cover all aspects of the agreement for lease of this acreage. The desire is to have an enjoyable business relationship between the parties. Should any issue be found to be left silent by this contract, it shall be resolved by a neutral third party based on the intent of both parties.

## 32. LIABILITY AND CHOICE OF LAW.

Failure of either Lessor or Kemin to comply with the agreement set forth in this lease shall make that person liable for damages to the other party and such damaged party may pursue any available remedy at law, with prevailing party being entitled to payment by the other the costs of such action, including attorney's fees. Regardless of the place of execution, the provisions of this Lease relating to the obligations of the parties shall be construed in all respects according to the laws of the State of Texas and the United States of America. English language version of this lease shall be the controlling document for interpretation purposes.

## 33. SURRENDER AND OVER-HOLDING.

Upon the expiration or other termination of the Term, the Lessee shall immediately quit and surrender possession of the Leased Premises and all leasehold improvements in substantially the condition in which the Lessee is required to maintain the Leased Premises excepting only reasonable wear and tear, and upon surrender, all right, title, and interest of the Lessee in the Leased Premises shall cease. If the Lessee continues to occupy the Leased Premises after the expiration or other termination of the Term without any further written agreement, the Lessee shall be a monthly Lessee at a Minimum Rent equal to three times the Rent paid by the Lessee immediately prior to the expiration or other termination of the Term but subject to all other provisions in this Lease. Notwithstanding the foregoing, Lessee shall have the right of entry for thirty (30) days after the expiration or termination of this Lease for the purpose of harvesting crop in the event such delay in harvesting is as a result of an Act of God.

## 34. ENTIRE AGREEMENT.

There is no promise, representation or undertaking by or binding upon the Lessor except such as are expressly set forth in this Lease, and this Lease including the Schedules contains the entire agreement between the parties hereto.

## 35. NOTICE.

Any notice required or contemplated by any provision of this Lease shall be given in writing and shall be sufficiently given if mailed by registered mail to the address of the other party as set out on page 1. This notification address may be amended by either party at any time by providing notice. Any notice shall be deemed to have been received five postal delivery days after the date of mailing. If it is reasonably anticipated that mail service may be disrupted or that immediate notification is required, notice must also be delivered or sent by telecopy or other form of immediate transmission and will be deemed received upon receipt.

## 36. SEVERABILITY.

All of the provisions of this Lease are to be construed as covenants and agreements. If any provision of this Lease is illegal or unenforceable, it shall be considered separate and severable from the remaining provisions of this Lease, which shall remain in force and be binding as though the provision had never been included.

## 37. HEADINGS AND CAPTIONS.

The headings and captions in this Lease are for reference purposes only and should not have any

effect on the interpretation of the Lease.

**38. TIME OF THE ESSENCE.**

Time shall be of the essence hereof.

In witness whereof, the parties have caused this Lease to be executed by their duly authorized representatives as of the date first written below.

|  | **Jay Kay Farms** |  | Kemin Industries, Inc. |
|---|---|---|---|
| By: | | By: | |
| Name: | | Name: | David A. GREAVES, Ph.D. |
| Title: | | Title: | Vice President, Specialty Crops |
| Date: | | Date: | 10/16/17 |

**EXHIBIT 1**



# FIRST AMENDMENT TO FARM LEASE

This First Amendment to the Farming Lease (the "**Amendment**") is made and entered into as of May 15, 2018 by and between **John G. Kain Farms, LLC, dba Jay Kay Farms** ("**Lessor**") and **KEMIN INDUSTRIES, INC.**, an Iowa corporation ("**Lessee**").

## RECITALS

A.   Lessor and Lessee entered into that certain Farming Lease of Jay Kay Farms Acreage, made  as of June 1, 2017 (the "**Lease**") regarding certain property in Frio County, State of Texas, as more fully described in the Lease.

B.   Pursuant to paragraph 2.2 of the Lease, after signing in 2017 but no later than Spring of 2018, 160 acres were to be added to the Lease from fields 15, 16 and 17. Notwithstanding, per Lessee's request, Lessor has agreed to add 162 acres from these fields and Lessor has agreed to pay an additional $36,450.00 in rent per year, thereby increasing the current total acreage of the Leased Premises to 1,097 acres and the annual lease payment provided in Section 3.1 to $246,825.00 per year.

C.   Lessee paid Lessor the additional rent of $36,450.00 for Lease Year 1 on or around February 26, 2018.

D.   Pursuant to paragraph 5 of the Lease, "Lessor will convert Well Number 3 to electric power as soon as possible after signing of this lease and will notify Lessee to allow for Lessee's inspection upon completion of said work."

E.   Lessee has agreed to advance the necessary funds to convert Well Number 3, in exchange for a credit against the rent owed by Lessee to Lessor in Lease Years 2 and 3.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.   Lessor and Lessee agree that 162 acres are added to the Leased Premises, for a current total of 1,097 acres, thereby increasing the annual lease payment to $246,825.00 per year.

2.   Section 3.1 of the Lease shall be supplemented to read as follows:

> Year 2: The annual lease payment shall be paid in one installment of two hundred forty-six thousand eight hundred twenty-five dollars ($246,825.00) on the one year anniversary of the signing of the Lease.
>
> Years 3-10: The annual lease payment shall be paid in two equal installments of one hundred twenty-three thousand four hundred twelve dollars and fifty cents ($123,412.50); the first payment to be paid on the anniversary of the signing of this Lease; and the second payment due on or before the immediately following February I of the given calendar year.
>
> Notwithstanding, the Parties agree that in exchange for advancing the necessary funds to convert Well Number 3 to electric power, Lessor shall provide Lessee with a credit against the lease payments Lessee is required to issue in Lease Years 2 and 3. Lessee shall receive credit for half of the final cost in Lease Year 2, and credit for the other half in Lease Year 3. For exemplary purposes only, if the final repair cost was exactly $45,408.00 as provided in the quote which is attached hereto and incorporated by reference into the Lease as Exhibit 2, Lessee would receive a $22,704.00 credit against the Year 2 lease payment requiring Lessee to pay $224,121.00 (payable in or before October 2018), and a $22,704.00 credit against the Year 3 lease payments requiring Lessee to pay $112,060.50 in each of the two installments (payable respectively in or before October 2019 and February 2020). The Parties acknowledge the final conversion cost may differ from the quote, but agree to calculate the respective credits in accordance with this paragraph.

1

PLAINTIFF'S EXHIBIT
B

Case 5:21-cv-00374   Document 1   Filed 04/12/21   Page 26 of 48

3. **Ratification.** Except as expressed amended and supplemented hereby, the Agreement shall remain in full force and effect, and the parties hereby ratify and confirm the terms and conditions thereof.

4. **Authorization.** Each Party to this Agreement represents and warrants to the other that it has the right, power and authority to enter into and perform its obligations under this Agreement and that it has taken all the requisite action to approve execution, delivery and performance of this Agreement, and this Agreement constitutes a legal, valid and binding obligation upon itself in accordance with its terms.

5. **Definitions.** Unless otherwise defined in this Amendment, all terms not defined shall have the meanings assigned to such terms in the Agreement, the Lease, and the Amendment.

6. **Counterpart; Signatures.** This Amendment may be executed by the parties in multiple counterparts, which together shall have the full force and effect of a fully executed agreement between the parties. Electronic signatures by either party are valid, and Lessee agrees that the Amendment and related documents and records may be created, kept and transmitted as electronic files only.

IN WITNESS WHEREOF, in consideration of the mutual covenants set forth above and for other good and valuable consideration, the receipt, adequacy, and legal sufficiency of which are hereby acknowledged, the parties have entered into the above Amendment and have caused their duly authorized representatives to execute this Amendment.

**Kemin Industries, Inc.**                           **Jay Kay Farms**

By _____                            By _____

Name: _____Jay Johnson_____                          Name _____

Title: _____Finance Director_____                    Title _____

Date _____5/18/18_____                               Date _____

**Exhibit 2**
**Price Quotation from Solansky Welding & Pump, Inc. to convert Well Number 2 to Electric.**



Solansky Welding & Pump, Inc
501 W Zavala St
Crystal City, TX 78839
830-374-3318



**QUOTE**

1804-039173   R6   PAGE   1   OF   1

| SOLD TO | JOB ADDRESS | ACCOUNT | | JOB |
|---------|-------------|---------|---|-----|
| JOHN G KAIN FARMS LLC<br>P.O. BOX 1433<br>Pearsall TX 78061- | JOHN G KAIN FARMS LLC<br>P.O. BOX 1433<br>Pearsall TX 78061-<br>(830) 334-7330 | 2281 | | 0 |
| | | CREATED ON | 04/30/2018 | |
| | | EXPIRES ON | 05/30/2018 | |
| | | BRANCH | 1000 | |
| | | CUSTOMER PO# | | |
| | | STATION | S3 | |
| | | CASHIER | RENEE | |
| | | SALESPERSON | | |
| | | ORDER ENTRY | SYLVIA | |
| | | MODIFIED BY | RENEE | |

Thank you for your business.

| Item | Description | D | Quantity | U/M | Price | Per | Amount |
|------|-------------|---|----------|-----|-------|-----|--------|
| PUMP-SUPPLIES | 350 HP MOTOR | N | 1 | EACH | 24473.0000 | EACH | 24473.00 |
| PUMP-SUPPLIES | 350 HP BENSHAW SOFT START | N | 1 | EACH | 8421.0000 | EACH | 8421.00 |
| PUMP-SUPPLIES | 2- 2" WEATHER HEADS | N | 1 | EACH | 28.0000 | EACH | 28.00 |
| PUMP-SUPPLIES | 540FT 3/0 wire | N | 1 | EACH | 2100.0000 | EACH | 2100.00 |
| PUMP-SUPPLIES | 4- 2" RIDGED | N | 1 | EACH | 175.0000 | EACH | 175.00 |
| PUMP-SUPPLIES | 2- HUBS 2" | N | 1 | EACH | 20.0000 | EACH | 20.00 |
| PUMP-SUPPLIES | 60ft- 1/0 wire | N | 1 | EACH | 239.0000 | EACH | 239.00 |
| PUMP-SUPPLIES | 2- ROUND RODS 5/8 W/CLAMPS | N | 1 | EACH | 40.0000 | EACH | 40.00 |
| PUMP-SUPPLIES | 2"- 40FT SEAL TITE | N | 1 | EACH | 280.0000 | EACH | 280.00 |
| PUMP-SUPPLIES | 4-CLAMPS | N | 1 | EACH | 88.0000 | EACH | 88.00 |
| PUMP-SUPPLIES | 2-UNISTRUTS | N | 1 | EACH | 44.0000 | EACH | 44.00 |
| PUMP LABOR | PUMP LABOR | N | 1 | EACH | 8000.0000 | EACH | 8000.00 |
| PUMP LABOR | RIG TIME | N | 1 | EACH | 1500.0000 | EACH | 1500.00 |
| COMMENT | ESTIMATED COST TO INSTALL<br>MOTOR AND SOFT-START WHICH<br>DEPENDS ON THE TIME TO DO THE<br>JOB. | | | | | | |
| COMMENT | 60% UPFRONT MONEY TO DO JOB. | | | | | | |

| | | | | Subtotal | 45,408.00 |
|---|---|---|---|----------|-----------|
| Quotes are good for 30 days. | | TEXAS 8.00% | Sales Tax | | 0.00 |
| | | EXE: RESALE | | | |
| | | | Total | | 45,408.00 |

Buyer:

_____
Signature

## Fwd: Notice of Lease Termination

From:   John (jgkain@gmail.com)

To.     rkincaidtx@yahoo.com

Date:   Tuesday, July 28, 2020, 4:33 PM CDT

Sent from my iPhone

Begin forwarded message:

> **From:** John Greaves <John.Greaves@kemin.com>
> **Date:** July 28, 2020 at 10:31:00 AM EDT
> **To:** "jgkain@gmail.com" <jgkain@gmail.com>
> **Cc:** Maddy LeDuc <maddy.leduc@kemin.com>
> **Subject: Notice of Lease Termination**

Dear John,

We have decided to close the oregano program at Kemin due to intense competition from low cost producers, making it no longer economically feasible for us to continue. Please find attached the notification of the land lease termination in compliance with the lease agreement.

Sincerely,

John

**John A. Greaves, Ph.D** I Vice President I Specialty Crops

1900 Scott Avenue, Des Moines, Iowa 50317 USA

Office: +1 515-559-5541 I  Mobile: +1 515-864-6890
john.greaves@kemin.com
**www.kemin.com**

*We strive to sustainably transform the quality of life every day
for 80% of the world with our products and services*

https://www.kemin.com/email-disclaimer



Notice to Recipient: This transmission including any attachments may contain confidential information that belongs to the sender and may be privileged by law. If you received this e-mail in error, any dissemination or copying of this e-mail is strictly prohibited. Unless explicitly designated as an electronic contract, this e-mail does not constitute a contract.

 image005.jpg
4kB

 image006.png
11.4kB

📄 John Kain Farms Notice of Termination 07272020.pdf

61.4kB



Kemin Industries, Inc.
1900 Scott Avenue
Des Moines, Iowa 50317, USA
+1 800-777-8307
www.kemin.com

September 29, 2020

*Via Registered Mail and Email*

Mr. John G. Kain
John G. Kain Farms, LLC
Jay Kay Farms
P.O. Box 1433
Pearsall, Texas 70861

Re:    Termination of Farm Lease

Dear John:

In response to your letter of August 26, 2020, the following actions have been taken or are in process:

1. Baker Irrigation inspected the pivots. Repairs have been made to all but one, which has a break in the underground power cable which will be found and repaired.
2. A new water meter and new pressure gauge have been installed on Well 2.
3. A new green gate has been installed.
4. New nozzle charts were ordered and 7B and 9/10 have been re-nozzled. 7A is nozzled correctly for 1200 gpm and two burnt fuses were replaced. The pivot now operates.
5. A contractor has been scheduled to remove and haul away the concrete, and the tote will be removed at that time as well.

The remaining item from your letter is the pump for well 1. Sections 1.2.6, 5, 22, 23 and 23.1 of the Lease provide that any repairs required to the wells, pivots, irrigation equipment, etc. which exceed $20,000 are to be shared equally between Kemin and yourself. To resolve this matter, in lieu of arranging for the repair of well 1, Kemin will make a payment in the amount of $20,000 in exchange for a release of any future claims. If this is agreeable to you, please sign the attached Lease Termination Lease Agreement and return one signed original to my attention. If you have any questions, please feel free to contact me.

Sincerely,

John A. Greaves, PhD
Vice President, Specialty Crops
Kemin Industries, Inc.

CC: Maddy LeDuc

**PLAINTIFF'S EXHIBIT**

D

## LEASE TERMINATION RELEASE AGREEMENT

This Release Agreement ("**Agreement**"), is made as of September 29, 2020 by and between John G. Kain Farms, LLC ("**Landlord**") and Kemin Industries, Inc. ("**Kemin**").

WHEREAS, Landlord and Kemin entered into that certain Farm Lease dated January 12, 2017 and all subsequent amendments (collectively, the "**Lease**") for lease of the premises described therein (the "Premises").

WHEREAS, the Lease has been terminated as of July 27, 2020 in accordance with its terms.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Payment</u>. Kemin agrees to pay Landlord the amount of $20,000.

2. <u>Release</u>. Landlord and Kemin hereby represent to the other that neither party has any outstanding debts, demands, actions, claims, suits, obligations, or liabilities whatsoever of any name or nature, whether in law or in equity against the other with respect to the Premises or the Lease or the termination of the Lease. Landlord and Kemin each release and discharge the other from any and all debts, demands, actions, claims, suits, obligations and liabilities whatsoever of any name or nature, whether in law or in equity, now or hereafter existing, arising out of, or in connection with the Lease and the Premises and the termination of the Lease.

3. <u>Counterparts</u>. This Termination may be executed in multiple counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same document.

IN WHITNESS WHEREOF, the parties hereto have executed this Termination as of the date first above written.

| Kemin Industries, Inc. | John G. Kain Farms, LLC |
|---|---|
| Signed: | Signed: |
| Name: JOHN A. GREAVES, PH.D | Name: |
| Title: VICE PRESIDENT, SPECIALTY CROPS | Title: |
| Date: OCTOBER 1ST 2020 | Date: |

LAW OFFICES
OF
# BROCK & BROCK
### A PROFESSIONAL CORPORATION

W. Burl Brock*
Karl B. Brock

803 E. Mistletoe
San Antonio, TX 78212
(210) 733-6666
Via Facsimile - ( 733-6893

*Board Certified
Personal Injury Trial Law
Texas Board of Legal Specialization

January 29, 2021

**_Via Electronic Mail_**
**_john.greaves@kemin.com_**
Mr. John A. Greaves
Kemin Industries, Inc.
1900 Scott Avenue
Des Moines, Iowa 50317

RE:     Lease Agreement between John G. Kain Farms LLC, d/b/a Jay Kay Farms and
          Kemin Industries, Inc., dated June 1, 2017

Dear Mr. Greaves:

I represent John G. Kain Farms, LLC, d/b/a Jay Kay Farms in regards to the above-referenced matter.  I am writing to address the breach of such agreement by Kemin Industries. This letter demand is being sent pursuant to Texas Civil Prac. & Remedies Code §38.001, et. seq.

John G. Kain Farms, LLC, d/b/a Jay Kay Farms (JKF) owns approximately 2,600 acres of agricultural land in Frio County, Texas.  Such land possessed 3 water wells and had 1,097 acres of irrigated land under pivot.  As a result, the subject property was incredibly valuable for agricultural purposes as it was not subject to drought conditions which normally affect dry land farmers.  Kemin Industries (Kemin), recognizing the benefits of such irrigated farm land, wished to enter into a long-term Lease Agreement for use of the land with the intent of growing crops suitable for their business.

The parties negotiated a Lease of said property through their various representatives over several months with several drafts being exchanged back and forth between the parties.  Kemin insisted that the existing water well, currently pumped with a diesel engine, be switched to electric at Jay Kay Farm's expense.  Jay Kay Farms agreed to accomplish same with Kemin's mutual agreement for the original term and a liquidated damages clause (4.1 - 4.4) for early termination to help defer the cost/expense of the conversion and added pivots.  When all parties were satisfied with the negotiated material terms, the Lease was executed by all parties.  The final agreement was drafted by Kemin and executed on or about October 16, 2017 by yourself,



Mr. John A. Greaves
Kemin Industries, Inc.
January 29, 2021
Page 2


John Greaves.  Attached hereto as *Exhibit A* and referenced herein as if fully set forth at length is a copy of the final Lease Agreement between the parties.

Generally speaking, the Lease contained the following material terms/conditions:

1.    Parties thereto (John G. Kain Farms, d/b/a Jay Kay Farms and Kemin)

2.    Property Leased; (2.1 - 2.2)

3.    Fixed Term Tenancy; (3.1 - 3.3)

4.    Definite Rental Rate; (3.1 - 3.3)

5.    Responsibilities/Obligations of the Parties during the Lease Term; (5, 6, 7, 8, 9 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30)

6.    Termination and Responsibilities/Obligations of the Parties Upon Termination (4.1 - 4.4).

Such terms provided a basic framework for the parties' actions and their relationship going forward.

Jay Kay Farms performed all contractual obligations under the Lease Agreement.  Kemin has wholly failed to perform their contractual responsibilities/obligations under the Lease Agreement.  Specifically, on or about July 28, 2020, Jay Kay Farms was notified by John Greaves that Kemin would be terminating the Lease early.  Jay Kay Farms fully expected Kemin to abide by the negotiated terms of the Lease Agreement they had previously negotiated, i.e. rental payments for an additional two (2) years as liquidated damages; return of the equipment and premises in "good working order;" and Lessee's help in finding a new Lessee.  Kemin, upon termination of the Lease, failed to abide by these material components of the agreement and have no legal excuse for their failure to perform.

Kemin's breach of its obligations and responsibilities under the Lease have caused monetary harm to Jay Kay Farms.  Specifically, Kemin, pursuant to the written Lease Agreement, owes Jay Kay Farms the following damages:

Mr. John A. Greaves
Kemin Industries, Inc.
January 29, 2021
Page 3


1.    Two annual payments totaling $493,650.00 (1,097.00 x $225.00/acre), plus
       interest thereon until paid in full (4.1 and 4.3);

2.    Repairs of Well and Irrigation Equipment - approximately $25,049.99, plus loss
       of use damages (23.2);

3.    Reasonable attorney's fees in the amount of $1,500.00 to date, as allowed by
       Texas Civ. Prac. & Rem. Code §38.001, et. seq. for its breach of the written Lease
       Agreement.

Pursuant to the agreement, Kemin has 30 days in which to cure such failures (4.1).  Failure to
cure such failure within the time designated will result in legal action to be taken against you for
all just and owed damages to which Jay Kay Farms may show itself to be justly entitled, whether
at law or in equity.  Our expectation is that Kemin will abide by the material terms of the
negotiated contract.  We look forward to a swift resolution of this matter.


                             Respectfully,

                             BROCK & BROCK, P.C.


                             KARL B. BROCK

KBB/tw
Attachment

cc:    Maddy LeDuc
        Maddy.leduc@kemin.com

        Amy Gandhi
        amy.gandhi@kemin.com

### Farming Lease of Jay Kay Farms Acreage

THIS LEASE made as of June 1, 2017 between John G. Kain Farms, LLC, dba Jay Kay Farms, of P. O. Box 1433, Pearsall, Texas 7806 (the "Lessor" or "Lessor") and Kemin Industries, Inc., of 2100 Maury Street, Des Moines, Iowa 50317, including its agents, assigns and representatives (the "Lessee" or "Kemin").

IN CONSIDERATION of the mutual covenants contained herein, the Lessor and Lessee, subject to the terms and conditions of this lease, hereby agree as follows:

## 1. COVENANTS.

As is Lease and Covenants: This is an **"as is"** lease. As such, Lessee agrees to accept the premises in its present as is condition, and to obey all laws, order, rules and regulations applicable to the use, condition, and occupancy of the premises. Lessee agrees to keep grass areas around center pivot points, in turn rows and long roadways mowed and will keep roadways maintained in good conditions. The following covenants apply without limitation to other covenants or obligations contained in this lease or required by law:

1.1. The Lessor covenants with the Lessee:

    1.1.1.  for quiet enjoyment of the Leased Premises; and

    1.1.2.  to observe and perform all the covenants and obligations of the Lessor herein.

1.2. The Lessee covenants with the Lessor:

    1.2.1.  to pay all amounts payable by the Lessee to the Lessor under this Lease (collectively the "Rent");

    1.2.2.  to observe and perform all the covenants and obligations of the Lessee herein;

    1.2.3.  to use the Leased Premises only for the purpose of farming legal crops on the Land and any and all uses ancillary thereto;

    1.2.4.  to comply with present and future laws, regulations and orders relating to the occupation or use of the Leased Premises;

    1.2.5.  not to do, omit to do or permit to be done anything which will cause or shall have the effect of causing the cost of the Lessor's insurance in respect of the Leased Premises to be increased at any time during the Term or any policy of insurance on or relating to the Leased Premises to be subject to cancellation.

    1.2.6.  to assume full responsibility for the operation and routine maintenance of the Leased Premises and for the routine repair or replacement of all fixtures or chattels located therein or thereon provided such repair or replacement is not a major repair or replacement exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's  liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises.

1.2.7.   to permit the Lessor to enter the Leased Premises at any time outside normal business hours in case of an emergency and otherwise during normal business hours where such will not unreasonably disturb or interfere with the Lessee's use of the Leased Premises or operation of its business, to examine, inspect and show the Leased Premises for purposes of leasing, sale or financing, to provide services or make repairs, replacements, changes or alterations as provided for in this Lease and to take such steps as the Lessor may deem necessary for the safety, improvement or preservation of the Leased Premises.

1.2.8.   to take out and maintain, in the name of the Lessor its agents and employees, the Lessee all risks property insurance with coverage for the full replacement cost value of the Leased Premises and other insurance as described herein.

1.2.9.   to promptly pay and discharge all expenses required to be paid by Lessee as described herein;

1.2.10.  to maintain the Leased Premises and all improvements therein in good order and condition;

1.2.11.  to cut or spray the weeds along the fences and to carry out and perform all acts required to be done under any Act or by regulations or by-laws with respect to weed and insect control;

1.2.12.  that no live trees on the Leased Premises will be cut and no crop residue such as straw or cornstalks will be burnt without the prior written permission of the Lessor;

1.2.13.  not to remove sand, gravel, topsoil or minerals from the Leased Premises;

1.2.14.  to pay all of the costs and expenses associated with the Lessee's obligations directly to the appropriate party as they come due and shall, at the Lessor's request, provide the Lessor with copies of receipts or other proof acceptable to the Lessor that such costs have been paid. If the Lessee fails to perform any obligation under this Lease or to pay any costs and expenses as set out herein, the Lessor may at its sole option and discretion, on seven (7) days written notice to the Lessee, perform such obligation or pay such amounts on behalf of the Lessee and the Lessee shall forthwith upon receipt of an invoice therefor reimburse the Lessor for the cost of such action or the amount of such payment.

## 2.   GRANT.

2.1.  Lessor hereby leases to the Lessee and the Lessee hereby leases from the Lessor approximately 935 acres of land (the "Land" or "Leased Premises") under and around current pivot irrigation in Frio County, Texas described by FSN 523 as the Jay Kay Ranch in Frio County, Texas, save and except certain areas as follows in Paragraph 16, a break down for each system covered by this lease is shown in the graphic attached hereto and made a part here of as Exhibit 1, with the following approximate acres measured from the center pivot point for each system:

80 acres of field number 1
80 acres of field number 2 and part of number 1

80 acres of field number 4
60 acres of field number 5a (western most pivot of field 5)
55 acres of field number 5b (eastern most pivot of field 5)
115 acres of field number 7a (western most pivot of field 7)
115 acres of field number 7b (eastern most pivot of field 7)
190 acres of fields number 9 and 10
160 acres of fields number 11 and 12

2.2. Additional acreage of approximately 335 acres of FSN 523 farmed under and around additional pivots systems during this lease will or may be added to the Land leased under terms in like manner as illustrated as follows:

160 acres to be added from fields 15, 16, and 17 (to be added after signing in 2017 but no later than in Spring of 2018)
110 acres to be added from fields 18 and part of 19 (to be added in Spring of 2018 if requested by Kemin in writing)
65 acres to be added from fields 8 and part of 19 ( to be added in Spring of 2018 if)requested by Kemin in writing)

Payment for additional acreage will be made within 30 days after new systems are up and operational for year 2017 and at annual anniversary for those installed in 2018.

## 3.  RENT AND TERM.
3.1. The term of this Lease shall be ten (10) years beginning on September 1, 2017 and ending on August 31, 2027 ("Term").  The rent for the acreage of this lease shall be $225.00 per acre payable annually as follows:

Years 1-2:  The annual lease payment shall be paid in one installment of two hundred ten thousand three hundred seventy-five dollars ($210,375.00) beginning at the signing of this Lease and on its one year anniversary.
Years 3-10:  The annual lease payment shall be paid in two equal installments of one hundred five thousand one hundred eight-seven dollars and fifty cents ($105,187.50); the first payment to be paid on the anniversary of the signing of this Lease; and the second payment due on or before the immediately following February 1 of the given calendar year.

3.2. All amounts payable by the Lessee to the Lessor pursuant to this Lease shall be deemed to be Rent and shall be payable and recoverable as Rent in the manner herein provided and the Lessor shall have all rights against the Lessee for default in any such payment as in the case of arrears of rent. The Lessee shall pay to the Lessor interest at a rate equal to one and a half percent (1.5%) per month, upon any default in payment of Rent from the due date for payment thereof until the same is fully paid and satisfied.

3.3. Renewal Option: There will be one (1) option to renew for 5 years if both parties agree to terms and considerations to be negotiated six (6)  months prior to renewal.  Lessee agrees to yield possession of the acres covered by this lease at the termination date of the lease.  Notwithstanding the number of renewals, if any, this lease is and always shall be interpreted as a fixed term lease and not an indefinite term lease.

## 4.  TERMINATION.

4.1  Lessor may terminate this Lease if Kemin fails to make payments to Lessor as provided in this Lease, giving Kemin a thirty (30) days notice to cure such failure plus interest at a rate of one and a half percent (1.5%) per month.  A thirty (30) day notice will be given for all breaches of this contract with each party being given a 30 day notice to correct said breach.

4.2.  Lessee shall have the right, at any time during the initial term or any renewal period hereof by giving notice in writing to Lessor, to terminate this Lease forthwith without judicial action in any of the following events:

   4.2.1.  Any breach of this Lease by Lessor not cured within thirty (30) days after written notice thereof;

   4.2.2.  Insolvency or bankruptcy of Lessor, and/or the appointment of a trustee or receiver in bankruptcy for Lessor, and/or inability or failure to perform obligations as the same become due;

   4.2.3.  A substantial change of ownership of Lessor effected without the prior written approval of Lessee;

   4.2.4.  Hiring a manager or personnel that is known by Lessee to be working with or have a history of working with a competitor of Lessee, provided however, that Lessor shall have an opportunity to terminate such a manager or personnel within thirty (30) days after receiving notification and verification from Lessee.

   4.2.5.  The acquisition or direct or indirect control of Lessor by any person, firm, company, or entity that competes with Lessee;

   4.2.6.  Lessor loses title to the Leased Premises or pivots furnished herein and does not cure within a reasonable time;

   4.2.7.  Irreversible loss or damage to Lessee's proprietary crop; or

   4.2.8.  In the event Lessee no longer engages in growing oregano and growing a replacement crop is not economically feasible.

4.3  In the event Lessee terminates the lease for any of the foregoing reasons, Lessee shall be responsible for the rent payment due to Lessor for a period of the following twenty-four (24) months and shall work with Lessor to find a new lessee. Notwithstanding the foregoing, Lessee cannot terminate for reasons set forth above in subparagraphs 4.2.7 and 4.2.8 until year 3 of this Lease.

4.4.  Lessee shall retain all rights to all cuttings, plugs, plants, biomass and all materials related to such upon termination of this Lease for any reason whatsoever.

## 5.  WELLS AND PUMPS.

This lease includes the use the Kain Number 1, 2 and 3 Carrizo water wells located on the property. All three wells have either almost new or like new Simmons Turbine Pumps with new column pipe, shaft and tubing. Well Number 1 is currently powered by electricity and was at last inspection in working order. Well Number 2 is also powered by electricity, but was recently struck by possibly lightning at the power pole.  Lessor will repair Well Number 2 at his cost as soon as possible and will notify Lessee to allow for Lessee's inspection to show the well in good working order.  Well Number 3

is currently powered by Detroit Diesel and has three phase power to the well head.  Lessor will convert Well Number 3 to electric power as soon as possible after signing of this lease and will notify Lessee to allow for Lessee's inspection upon completion of said work. Lessee will  then use, repair, and maintain said wells at his sole cost. Lessee's obligation to pay for repairs and replacement shall not include major repairs or replacement exceeding twenty thousand ($20,000.00) dollars.  If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's  liability not exceeding twenty thousand ($20,000) dollars except as follows.

Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. Lessee, or anyone in lessee's organization, has no authority to adapt, change or tamper with these wells, pumps or motors in any way without written approval from Lessor PRIOR to such work being performed. Solansky Pump and Welding will be used for all well and pump work. Lessee agrees to maintain constant drip oil in the pumps along with all other directives of Solansky Pump and Welding. Solansky phone number is 830/374-3318. Lessee agrees to pay Solansky Pump and Welding within 30 days of invoice date for work done on the property covered by this lease.  Lessee agrees to return these wells in good working order per Solansky Pump and Welding or a successor company and make any repairs or replacements deemed necessary by said company at the end of the lease. Notwithstanding, if Solansky Pump and Welding is unavailable or no longer in business, Lessor may appoint another contractor to perform the work.

## 6.  FARMING EQUIPMENT.

Lessee shall furnish all of its farming equipment as well as any non-farming equipment as needed by it in its operation at his its expense, and keep the premises neat and orderly.

## 7.  FENCES.

Lessee further agrees not to cut or alter any fences or gates unless expressly agreed to in writing by Lessor, and also agrees to maintain the entrances to the Leased Premises from FM 1582 and CR 3401. Lessee agrees not to break established water courses or ditches, or undertake any operation that will injure the Leased Premises. Lessee is to repair, replace, or maintain all fences and will leave the property in as good or better condition as Lessee found it provided such repair or replacement is not a major repair or replacement exceeding twenty thousand dollars ($20,000.00). If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's  liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. Any new fences, whether built by Lessor or Lessee at any time during this lease, will be repaired to like new condition by Lessee as needed if damage has occurred to these fences as a result of Lessee, or any of Lessee's operations prior to the expiration of this contract. Lessee may build fences for his own benefit at his sole cost, with prior written approval of Lessor as to type, location, and construction of said fences.  Lessor and Lessee will meet prior to the signing of this lease to discuss possible sites for internal fencing if needed.

## 8.   ADDITIONSA AND IMPROVEMENTS.

Lessor and Lessee agree that any permanent additions to the property will remain with the property and become property of the Lessor.  Any improvements by Lessor, any oil company, or associated company to the property will be the property of the Lessor. Any temporary improvements by Lessee which result in Real Estate Taxes known locally as Roll Back Taxes will be paid by Lessee for the period of five (5) years prior to assessment of said Taxes and for the period of five (5) years forward from the termination date of lease or any renewal when the temporary improvements are removed. Any improvement of any

kind, whether temporary or permanent must have prior written approval from the Lessor as to the location of said improvements.

## 9. INDEMNITY, LIMITATION ON LESSOR'S LIABILITY AND WARRANTY.

9.1. The parties covenant and agree that as a consideration for the granting of this lease, Lessee agrees to indemnify and hold the Lessor harmless. The Lessee shall indemnify and save harmless the Lessor and its agents and employees from any and all liabilities, damages, costs, claims, suits or actions growing or arising out of:

    9.1.1.  any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of the Lessee to be fulfilled, kept, observed and performed;

    9.1.2.  any damage to property while the property is in or about the Leased Premises; and

    9.1.3.  any injury to person or persons including death resulting at any time therefrom occurring in or about the Leased Premises as a result of Lessee's negligent conduct.

9.2. Lessor warrants that it has title or the right to lease the Leased Premises and pivots provided herein under this Lease. Notwithstanding the foregoing, Lessor has disclosed to Lessee that the title to pivot 7A may be challenged by third parties ("Title Dispute"). In such event, Lessor agrees to defend against Title Dispute at its own cost and expense until final resolution by agreement or final non-appealable judgment by a court of competent jurisdiction. In the event Lessor loses title to said pivot Lessor shall without delay and at its sole cost remedy the situation to ensure Lessee's crop is not compromised. In connection therewith, Lessee agrees without delay to cooperate fully with Lessor and to provide any information available and assistance that will assist Lessor in protecting the crop.

9.3. Hold harmless agreement: Lessee further covenants and agrees to indemnify, defend, and hold harmless the Lessor from and against any and all damages, claims, suits, demands, and actions of any kind, whether for injury to person or loss of life, or damage to property resulting from or arising out of the use of the Leased Premises by Lessee and for the damage to anyone or anything resulting from Lessee's farming operations or any other operations on the Leased Premises. Likewise, Lessee shall be liable for any attorney fees incurred by Lessor defending themselves from any claims mentioned above including but not limited to:

    9.3.1.  From theft in or about the premises resulting from Lessee's negligent conduct;

    9.3.2.  From interruptions in any electrical service from any cause whatsoever;

    9.3.3.  From any injury to any person of damage to any goods, wares, property or merchandise caused by Lessee's negligence

    9.3.4.  From spraying, fertilizing and chemical applications by Lessee affecting the premises or surroundings.

9.4. Limitation of Lessor's Liability: The Lessor and its agents and employees shall not be liable for any damage to the Leased Premises or any property located therein caused by any latent defect or by steam, water, rain or snow which may leak into, issue or flow from any part of the Leased Premises or from the water, steam, sprinkler or drainage pipes or plumbing works of the same or from any other place or from any damage caused by or attributable to the condition or arrangement of any electrical or other wiring or for any damage caused by anything done or omitted to be done by any person or for damage caused by interruption or failure of any service or utility or for

damage however caused to merchandise, stock in trade, books, records, files, money, securities, negotiable instruments, papers or other valuables.

9.5. Liability Insurance: The Lessee agrees during the Term to secure and pay the premium upon a policy of liability insurance against liability claims for bodily injury, property damage and death arising out of or in connection with Lessee's operation of the property described under the terms of this Lease with minimum liability limits of a minimum of $300,000.00 for injury to or death of one person, $1,000,000.00 for all claims arising out of one (1) occurrence, property damage limits of $100,000.00, and an umbrella policy of a minimum of $1,000,000.00. Lessee also agrees to furnish to Lessor a copy of Lessee's insurance binder listing Lessor as an additional insured on Lessee's policy within 30 days of execution of this lease.

## 10. HUNTING AND FISHING.

There will be absolutely no hunting or fishing allowed by Lessee or anyone associated with Lessee on the Leased Premises or any of Lessor's property, and this lease conveys no right to Lessee or anyone associated with Lessee to hunt or fish on the Leased Premises or any of Lessor's property. Lessor expressly retains all rights to the hunting and fishing. Notwithstanding the foregoing, Lessor shall refrain from accessing or allowing access to the Leased Premises for the purpose of hunting or fishing without prior approval from Lessee. Lessee shall respond to Lessors inquiry for permission to hunt or fish within 24 hours of receipt of such inquiry. Lessee's failure to respond to Lessor's inquiry within 24 hours shall be deemed as providing permission. Notwithstanding, Lessor shall retain the right of hunting for the purpose of predator control without the requirement of notice to Lessee. Lessor's use of the Leased Premises as set forth in this paragraph will not interfere with the Lessee's use or quiet enjoyment of the Leased Premises.

## 11. ASSIGNMENT, SUBLEASING, PLEDGING AND TRANSFERS BY LESSEE.

With the Lessor's prior written consent including but not limited to Lessor agreeing to the terms and conditions thereunder, Lessee may assign, sublet, pledge or transfer this Lease or any interest therein or in any way part with possession of all or any part of the Leased Premises, or permit all or any part of the Leased Premises to be used or occupied by any other person. Lessor shall not unreasonably withhold consent. It shall not be unreasonable for Lessor to withhold consent if a person to whom an assignment, sublease, pledge or transfer is proposed is not financially healthy, does not have an acceptable business reputation, or is not agreeable to the same conditions and terms set forth in this Lease. Additionally, Lessee may not enter any such agreement or instrument with a third party that limits Lessee's liability, duties or obligations under this Lease, without the express written authorization of Lessor.

## 12. GATES AND SECURITY.

Lessee agrees to keep all gates locked and use locks furnished by Lessor. Lessor will supply Lessee with keys needed for his operation, and Lessee will furnish names and identification of those individuals to whom the keys shall be issued and a description of the vehicles that will be commonly used on the property.

## 13. WILDLIFE PROGRAMS AND WATER.

Wildlife Management Program currently implemented by the Lessor must not be harmed in any way by operations of Lessee. Lessee agrees to keep current water reservoirs and tanks piped to from the Number 1, 2 and 3 water wells as full as possible at all times due to the fact that certain crops will require a water priority from time to time and water will understandably be diverted to crops during

these times. Lessor retains the right to pump from these reservoirs and tanks for uses as Lessor deems necessary.

## 14. SUCCESSORS AND ASSIGNS.

This Lease shall enure to the benefit of and be binding upon the successors and assigns of the Lessor and the heirs, executors and administrators and the permitted successors and assigns of the Lessee.

## 15. SUBORDINATION.

Lessor shall refrain from creating a mortgage, deed of trust or other similar lien or encumbrance (a "Mortgage") upon or affecting Landlord's fee estate in the Property or title to the pivots thereon. Notwithstanding the foregoing, in the event Lessor creates a security interest in the form of a Mortgage upon or affecting Lessor's fee estate in the Property or title to the pivots, or any part thereof, with the consent of Lessee, Lessor shall provide a recordable SNDA acceptable to Lessee whereby Lessee's rights to the Property and pivots will not be disturbed by any mortgagee so long as Lessee continues to abide by the terms of this Lease. Any holder of any such Mortgage is herein referred to as "Landlord's Mortgagee(s)." Notwithstanding the foregoing, an approved Landlord's Mortgagee may at any time subordinate its Mortgage to this Lease without Lessee's consent by notice in writing to Lessee, and thereupon this Lease shall be deemed prior to such Mortgage without regard to their respective dates of execution and delivery and, in that event, such Landlord's Mortgagee shall have the same rights with respect to this Lease as though it had been executed prior to the execution and delivery of any such Mortgage and had been assigned to such Landlord's Mortgagee.

## 16. OFF-LIMIT AREAS.

Certain areas which are strictly off limits are areas around any oil or gas well, whether existing at the time of signing of this lease, added after signing or planned for future development of the property for oil and gas purposes, provided such addition after the signing of this Lease does not interfere with Lessee's use of the Leased Premises. The area inside the fence around the Jay Kay Ranch Airport is also an off-limit area. No improvement is to be erected in the flight path of the Jay Kay Ranch Airport.

## 17. OIL AND GAS EXPLORATION AND DEVELOPMENT.

Lessee is aware that the property is under an agreement or is in negotiation for an agreement for the development of the property for oil and gas exploration. Each lease agreement is independent of the other. However, this lease is subject to conditions of the oil and gas lease, as it is currently in place or any oil and gas lease that is executed in the future. Lessor has tried to lessen the impact of such exploration on the leased property. Planned well sites are on the eastern and western most perimeter property lines and in property corners or other areas not within the circle under irrigation equipment. Placement is designed to lessen the impact on any given irrigation circle. Any oil or gas lease will not affect Lessee's use of any acreage under an anchor pivot. However, there may be some impact and that acreage removed from the leasable acreage, namely acreage that is not under an anchor pivot, and the rental payments will be adjusted accordingly should this occur. Additionally, in the event of loss of acreage on which Lessee has planted crop (i.e. acreage under an anchor pivot), Lessor shall compensate Lessee for loss of said crop, including but not limited to establishment. The stated oil and gas exploration shall have priority in all instances. The oil and gas companies and their affiliated parties are responsible for all their damages to the property and to the Lessee, only to the extent that the damage has occurred to improvements or crops of Lessee and at the actual dollar cost of the improvement or crop. Lessee should notify Lessor should any damages occur prior to contacting the oil and gas company, whomever they should be.

**18. ELECTRIC BILLS.**

Lessee has agreed to pay the Medina Electric bills upon receipt covering the current electric motor and pivots and any future electric motors installed for the Leased Premises during the term of this Lease.

**19. GOVERNMENT PROGRAMS.**

From time to time, the usage of the Equip Program of the Farm Services Agency may become available. Lessee may use this program for its benefit at its sole cost and expense. At no time will any use of this program encumber the Leased Premises or obligate the Lessor in any way. Should Lessee wish to have Lessor participate in such programs, Lessor would have to consent in writing prior to any obligation. Lessor retains all rights to any USDA programs associated with the property, such as the DCP programs and alike.

**20. AMENDMENT OR MODIFICATION.**

This lease may be amended, modified or supplemented only in writing, and any amendment, modification or supplement shall not be valid or binding unless signed and dated by both Lessor and Lessee.

**21. PASTURES AND FIELDS.**

Lessee agrees to keep all areas where center pivot circles are and places where new ones may be in the future clear of brush and obstruction, and maintained as cleared pastures or fields and just in the circular pattern covered by each system. The areas referred to are in exhibit 1 attached to this lease.

**22. IRRIGATION AND RELATED EQUIPMENT.**

Lessee agrees to maintain all pivots and above ground equipment during the Term, including but not limited to drip oil used to lubricate downhole shaft, tubing, and pump. However, Lessee shall inspect all pivots and above ground equipment within 10 days of signing this Lease and notify Lessor of its findings. Should any downhole damage or underground line damage occur that can be attributed to Lessee's neglect or misuse, Lessee will be held responsible for the routine repair or replacement to return the well or wells and lines to working condition provided such repairs or replacements are not major repairs or replacements exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. The diesel fuel at the pole barn location on the western side of CR 3401 and at the location known as the Numbers 2 water well on the eastern side of CR 3401 are for Lessor's use only. If crops are planted, Lessee agrees to hold Lessor harmless should any failures in irrigation equipment occur and for whatever reason cannot be fixed or returned to operation in a timely manner due to circumstances beyond Lessor's control. Should this situation arise, all parties agree to work together to get water to crops as soon as possible in order to avoid any damage.

**23. SYSTEMS, EQUIPMENT AND IMPROVEMENTS.**

23.1. Lessor to furnish Lessee during the term hereof with fully operational self-propelled irrigation systems including water sources and power sources as stated in this Lease under Premises Description. Said systems to be used by the Lessee on the Leased Premises only. Other system(s) to be added under terms of the Paragraph 2 of this lease agreement. Lessee to make all routine repairs and replacements to the systems during the term of the lease which are necessary to keep

said systems in working order including but not limited to the well, turbine, power unit, system alignment, all electrical systems, tire and wheel repair, gear boxes, driveshaft's and final drives provided such repairs or replacements are not major repairs exceeding twenty thousand ($20,000.00) dollars. If such a repair or replacement exceeds twenty thousand ($20,000) dollars, Lessor and Lessee shall equally share the cost with Lessee's liability not exceeding twenty thousand ($20,000) dollars except as follows. Notwithstanding the foregoing, Lessee shall pay for all repairs and replacements, whether routine or major, resulting directly from its use of the Leased Premises. Lessee shall bear the expenses of all repairs resulting from the negligence of the Lessee, its agents and employees. Lessor shall cover all damage to said systems during the term of the lease which is due to Acts of God, and shall forthwith have said damage to the systems repaired under Lessors insurance policy. Lessor shall not be liable for any resulting crop damage due to damage to the irrigation system(s) or any type of mechanical failure of the irrigation system(s) and related equipment caused by Acts of God.

23.2. Lessee shall at the expiration of said lease return the demised premises, irrigation system(s) and related equipment to Lessor in good working order, only ordinary wear and tear from normal use excepted. Lessor shall be allowed free access to the premises to examine or inspect the irrigation system(s) or to make needed alterations or improvements to the total system(s). Responsibility for the costs of all oil, lubrication, fuel and general maintenance required to operate the irrigation system(s) shall be that of the Lessee. The contacts for the Reinke systems is Mike Titzman @ 830/480-0622 or Don Baker @ Baker Irrigation in Uvalde, Tx. Mike Titzman or a Reinke dealer must to be used in order to maintain the integrity of the warranties on those systems.

23.3. Lessee and Lessor agree that the sole responsibility for the physical operation of the entire irrigation system(s) is that of the Lessee.

23.4. Lessor agrees that he will instruct Lessee on the operation of the system(s) and water sources in order that the Lessee may operate the same in the absence of the Lessor whenever necessary. It is agreed by Lessor and Lessee that Lessee may fertigate or chemigate through the irrigation systems during the term of the lease. Lessee shall provide for proper plumbing, injection pump, electrical and safety equipment on the entire irrigation system(s) to allow chemigation and fertigation. All costs of chemicals and fertilizer will be paid for by Lessee.

23.5. The Lessee may from time to time at its own expense make changes, additions and improvements to the Land to better adapt the same to its business, provided that any change, addition or improvement shall be made only after obtaining written consent of the Lessor, and shall be carried out in a good and workmanlike manner and only by persons selected by the Lessee and reasonably approved in writing by the Lessor. The Lessee shall pay promptly when due all costs for work done or caused to be done by the Lessee in the Leased Premises which could result in any lien or encumbrance on the Lessor's interest in the property, shall keep the title to the property and every part thereof free and clear of any lien or encumbrance.

## 24. WATER PRIORITY.

Due to the fact of the time-sensitivity of the watering regime during the growing season, it is agreed Lessee shall have priority for water usage as long as tanks and reservoirs are full.

**25. TITLE.**

25.1. Lessee shall use the Lease Premises solely for farming. Lessor agrees that title to any crop shall vests always in said Lessee and Lessee shall bear all expenses of producing same. Lessee may cultivate 935 acres plus an additional 335 acres set out in Premises on Page 3 of Kemin proprietary oregano clonal lines KII750 and KII850 or other Kemin proprietary clonal lines or other desired crop. Lessor acknowledges that cuttings, plugs, plants, and biomes and all related to such remain property of Kemin at all times. Kemin agrees to destroy said plants, plugs, cuttings, and biomes and any other related materials prior to termination lease term, and disk up and clean fields to plantable condition by termination date.

25.2. Lessor acknowledges that Lessee or its assignee shall retain all rights and title in and to the proprietary oregano clonal lines, KII750 and KII850, any and all biomass resulting from the growing of said proprietary clonal lines, and any and all oil produced by steam distilling said proprietary clonal lines. Lessor shall not place a lien on or encumber in any way Lessee's proprietary oregano clonal lines, KII750 and KII850, any and all biomass resulting from the growing of said proprietary clonal lines, and any and all oil produced by steam distilling said proprietary clonal lines. Lessor acknowledges and agrees that Lessee may file and perfect a lien upon the crops grown under this Lease.

**26. CUSTOM WORK.**

Any custom work whereby Lessee hires Lessor or Lessor hires Lessee will be by separate agreement and at prevailing custom rates and agreed to by both parties on each particular project or job.

**27. SOIL AND WATER TESTING.**

Lessee shall have the right to make such soil and water tests as he deems necessary. Lessor agrees to provide what tests he currently has to Lessee if asked to provide such tests.

**28. END GUN CLARIFICATION.**

All irrigation systems except the one located in field 5b have endguns, and acreage covered by those endguns are included in the acreage as irrigated land.

**29. AIRSPRAY.**

To the best of the knowledge of the Lessor, there are no restrictions on the above-described land with regard to the usage of airplanes for the application of pesticides according to labeled usage during the term of this lease

**30. SELL OF PROPERTY.**

The Leased Premises under current ownership is not now and has not been listed for sale, and there is no intent to list or sell the property in the foreseeable future. However, even with the best of plans, circumstances arise which require tough decisions. Lessor retains the right to sell the property if he deems circumstances necessary for him to do so. Any such transfer shall be subject to this Lease Lessor will inform Lessee as soon as Lessor has made the decision to sell the property so that Lessee may have a first right of refusal to purchase the Leased Premises and adjacent acreage proposed for sale. Lessee shall have thirty (30) days to effectuate its option. In the event Lessee purchases the Leased Premises, this Lease will terminate on date closing of sale.

**31. INTERPRETATION OF LEASE.**

All effort has been made to cover all aspects of the agreement for lease of this acreage. The desire is to have an enjoyable business relationship between the parties. Should any issue be found to be left silent by this contract, it shall be resolved by a neutral third party based on the intent of both parties.

## 32. LIABILITY AND CHOICE OF LAW.

Failure of either Lessor or Kemin to comply with the agreement set forth in this lease shall make that person liable for damages to the other party and such damaged party may pursue any available remedy at law, with prevailing party being entitled to payment by the other the costs of such action, including attorney's fees. Regardless of the place of execution, the provisions of this Lease relating to the obligations of the parties shall be construed in all respects according to the laws of the State of Texas and the United States of America. English language version of this lease shall be the controlling document for interpretation purposes.

## 33. SURRENDER AND OVER-HOLDING.

Upon the expiration or other termination of the Term, the Lessee shall immediately quit and surrender possession of the Leased Premises and all leasehold improvements in substantially the condition in which the Lessee is required to maintain the Leased Premises excepting only reasonable wear and tear, and upon surrender, all right, title, and interest of the Lessee in the Leased Premises shall cease. If the Lessee continues to occupy the Leased Premises after the expiration or other termination of the Term without any further written agreement, the Lessee shall be a monthly Lessee at a Minimum Rent equal to three times the Rent paid by the Lessee immediately prior to the expiration or other termination of the Term but subject to all other provisions in this Lease. Notwithstanding the foregoing, Lessee shall have the right of entry for thirty (30) days after the expiration or termination of this Lease for the purpose of harvesting crop in the event such delay in harvesting is as a result of an Act of God.

## 34. ENTIRE AGREEMENT.

There is no promise, representation or undertaking by or binding upon the Lessor except such as are expressly set forth in this Lease, and this Lease including the Schedules contains the entire agreement between the parties hereto.

## 35. NOTICE.

Any notice required or contemplated by any provision of this Lease shall be given in writing and shall be sufficiently given if mailed by registered mail to the address of the other party as set out on page 1. This notification address may be amended by either party at any time by providing notice. Any notice shall be deemed to have been received five postal delivery days after the date of mailing. If it is reasonably anticipated that mail service may be disrupted or that immediate notification is required, notice must also be delivered or sent by telecopy or other form of immediate transmission and will be deemed received upon receipt.

## 36. SEVERABILITY.

All of the provisions of this Lease are to be construed as covenants and agreements. If any provision of this Lease is illegal or unenforceable, it shall be considered separate and severable from the remaining provisions of this Lease, which shall remain in force and be binding as though the provision had never been included.

## 37. HEADINGS AND CAPTIONS.

The headings and captions in this Lease are for reference purposes only and should not have any

effect on the interpretation of the Lease.

**38. TIME OF THE ESSENCE.**
   Time shall be of the essence hereof.

In witness whereof, the parties have caused this Lease to be executed by their duly authorized
representatives as of the date first written below.

<table>
<tr><td><strong>Jay Kay Farms</strong></td><td>Kemin Industries, Inc.</td></tr>
<tr><td>By: _____</td><td>By: _____</td></tr>
<tr><td>Name: _____</td><td>Name: <em>John A. GREAVES, Ph.D.</em></td></tr>
<tr><td>Title: _____</td><td>Title: <em>Vice President, Specialty Crops</em></td></tr>
<tr><td>Date: _____</td><td>Date: <em>10/16/17</em></td></tr>
</table>

**EXHIBIT I**

